UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
MATTHEW FULKS,                            :
                                          :
                                          :   16 Civ. 4278 (JSR)
        Plaintiff,                        :
                                          :   OPINION AND ORDER
          -v-                             :
                                          :
BEYONCÉ GISELLE KNOWLES-CARTER,           :
SONY MUSIC ENTERTAINMENT,                 :
PARKWOOD ENTERTAINMENT, LLC,              :
HOME BOX OFFICE, INC.,                    :
S. CARTER ENTERPRISES, LLC,               :
BLACK PANTHER BIDCO, LTD.,                :
                                          :
                                          :
        Defendants.                       :
------------------------------------------x

JED S. RAKOFF, U.S.D.J.

        By bottom-line Order dated August 31, 2016, this Court granted

defendants' motion to dismiss plaintiff's Second Amended Complaint

("SAC"). The pleadings allege that defendants' distribution of a

film trailer (the "Trailer") and film itself (the "Film") promoting

the release of the musical album "Lemonade" infringe plaintiff's

copyright in the short film "Palinoia." This Opinion explains the

reasons for its ruling and directs the entry of final judgment.

        On a motion to dismiss, the Court accepts all well-pleaded

factual allegations as true and draws all reasonable inferences in

favor of the non-moving party. See Goldstein v. Pataki, 516 F.3d 50,

56 (2d Cir. 2008).  Where, as here, a plaintiff alleges copyright

infringement, "the works themselves supersede and control contrary

descriptions of them, including any contrary allegations,

conclusions or descriptions of the works contained in the
pleadings." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,
602 F.3d 57, 64 (2d Cir. 2010) (internal quotation marks omitted).

The allegations of the SAC relevant to the motion to dismiss
are as follows. Plaintiff Matthew Fulks is an independent filmmaker
and creative director at a popular television station. SAC ¶¶ 1-2,
ECF No. 26. In July 2014, plaintiff completed a seven-minute short
film entitled Palinoia, which depicts "the pain of a tumultuous
relationship." Id. ¶ 3. The short film consists of "seemingly
unrelated visuals in rapid montage, with the recitation of a poem
used as voiceover against a distinctive soundtrack." Id. ¶ 4. The
protagonist is a Caucasian male.[1] An unseen individual speaks French
in the background of several scenes, id. ¶¶ 4, 57, and there are
English subtitles.[2]

In April 2016, defendants aired the Trailer and Film in order
to promote the release of defendant Beyoncé Knowles-Carter's
"Lemonade" album. Id. ¶¶ 15, 25, 61. The 58-minute Film tells the
story of an African-American woman's journey from heartbreak to
healing. Defs.' Mem. of Law in Support of Mot. to Dismiss the SAC
("Defs.' Br.") at 5, ECF No. 32. It features 11 songs from Lemonade,

---

[1] The SAC does not describe the physical attributes of the
protagonist of Palinoia. However, the protagonist's attributes are
clear on the face of the short film. See SAC ¶ 20 (incorporating
Palinoia by reference); Peter F. Gaito Architecture, 602 F.3d at 64.

[2] Although the SAC does not allege the presence of subtitles, these
are plainly visible to the viewer throughout the short film.

connected by interludes of dialogue and poems. Id. The Film has thematic headings, which evoke the Kubler-Ross stages of grief,[3] and reflect the content of each chapter: "Intuition," "Denial," "Anger," "Apathy," "Emptiness," "Accountability," "Reformation," "Forgiveness," "Resurrection," "Hope," and "Redemption." Id. The Film closes with a title card reading "Lemonade." Id. at 11.

The 65-second Trailer features a rapid succession of visuals excerpted from the Film, "with the recitation of a poem used as voiceover against a distinctive audio soundtrack." SAC ¶ 16. The Trailer ends with a card titled "Lemonade," id. ¶ 73(6), followed by a "screen shot promoting an HBO film, also called Lemonade," id. ¶ 23.

On June 8, 2016, plaintiff filed his complaint, which he amended on June 20, 2016 and July 13, 2016. The SAC brings one count of copyright infringement under the Copyright Act of 1976 against all defendants. Plaintiff alleges that the Trailer and the Film infringe his copyright in Palinoia because they contain: (1) nine examples of "visual" similarities; (2) "audio" similarities; and (3) similarities in "total concept and feel." Id. ¶¶ 72-79.

In the absence of direct evidence of copying, copyright infringement requires showing "(a) that the defendant had access to

---

[3] "In a well-known book, Dr. Elisabeth Kübler-Ross proposed five stages of normal grief – denial and isolation; anger; bargaining; depression; and acceptance." Cruz v. Diaz, No. CV 13-4484-RGK (AS), 2015 WL 7293146, at *18 (C.D. Cal. Oct. 22, 2015) (citing Dr. Elisabeth Kübler-Ross, On Death and Dying, (1969)).

the copyrighted work and (b) the substantial similarity of
protectible material in the two works." Kregos v. Associated Press,
3 F.3d 656, 662 (2d Cir. 1993). Defendants do not dispute access on
this motion. Instead, they move for dismissal on the ground that the
allegedly infringing works are not "substantially similar" to
Palinoia as a matter of law.

      "The test for infringement of a copyright is of necessity
vague." Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d
487, 489 (2d Cir. 1960). Works are substantially similar if an
"ordinary observer, unless he set out to detect the disparities,
would be disposed to overlook them, and regard [the] aesthetic
appeal as the same." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101,
111 (2d Cir. 2001) (internal quotation marks omitted). In applying
the test, courts "compar[e] the contested design's total concept and
overall feel with that of the allegedly infringed work . . . as
instructed by our good eyes and common sense," Peter F. Gaito
Architecture, 602 F.3d at 66 (internal quotation marks omitted).
Courts then ask whether "an average lay observer would recognize the
alleged copy as having been appropriated from the copyrighted work,"
Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1001 (2d Cir. 1995)
(internal quotation marks omitted). "[I]n the end, [the] inquiry
necessarily focuses on whether the alleged infringer has
misappropriated the original way in which the author has 'selected,
coordinated, and arranged' the elements of his or her work." Peter

F. Gaito Architecture, 602 F.3d at 66 (internal quotation marks omitted).

Though often a fact-intensive question, the Second Circuit has "repeatedly recognized that, in certain circumstances, it is entirely appropriate for a district court to resolve [substantial similarity] as a matter of law, 'either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'" Id. at 63 (quoting Warner Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231, 240 (2d Cir. 1983)). Indeed, "[w]hen a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because what is required is only a visual comparison of the works." Id. at 64 (internal quotation marks omitted).

"Before embarking on the substantial similarity analysis, it is critical to bear in mind what does not amount to infringement under the Copyright Act." Croak v. Saatchi & Saatchi, N. Am., Inc., No. 15 CIV. 7201 (JSR), 2016 WL 1274713, at *3 (S.D.N.Y. Mar. 31, 2016). As an initial matter, "the similarity between two works must concern the expression of ideas, not the ideas themselves." Peter F. Gaito Architecture, 602 F.3d at 67. In addition, under the doctrine of scènes à faire, "elements of an image that flow naturally and necessarily from the choice of a given concept cannot be claimed as original." Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F.

Supp. 2d 382, 392 (S.D.N.Y. 2005); see 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[B][4] ("Labeling certain stock elements as 'scenes a faire' does not imply that they are uncopyrightable; it merely states that similarity between plaintiff's and defendant's works that are limited to hackneyed elements cannot furnish the basis for finding substantial similarity"(footnote omitted)).

To be sure, distinguishing idea from protected expression can be challenging because "ideas can be defined at varying levels of generality." Croak, 2016 WL 1274713, at *3 (citing Nimmer & Nimmer, § 13.03[B][2]). Defining the boundaries of an unprotected "stock element" can be similarly vexing because, in Voltaire's somewhat tongue-in-cheek formulation, "originality is nothing but judicious imitation."[4] The present dispute, however, does not require the Court to voyage far. Plaintiff's alleged similarities consist almost entirely of clearly defined ideas not original to plaintiff and of stock elements with which even a casual observer would be familiar. Moreover, to the very limited extent that there are even any superficial similarities, these are overwhelmed by the works' vastly different creative choices and overall aesthetic feel.

The Court begins with plaintiff's nine examples of alleged "visual" infringement. The SAC contains nine side-by-side still

---

[4] Louis Mayeul Chaudon, Historical and Critical Memoirs of the Life and Writings of M. de Voltaire 290 (1786).

shots from the allegedly infringing works and Palinoia.[5] SAC ¶ 73(1)-
(9). While the still shots constitute only a small portion of the
58-minute Film, they comprise the majority (nearly 39 seconds) of
the 65-second Trailer. Id. ¶ 72. Accordingly, the Court must address
whether these still shots bear substantially similarity in protected
expression. While the SAC gives descriptions of allegedly similar
cinematography in these shots, id. ¶ 73(1)-(9), it does not plead
the allegedly shared aesthetic for seven of the nine scenes.[6] The
presence of similar cinematography may be relevant, but the ultimate
question is whether an "ordinary observer" would "regard [the]
aesthetic appeal as the same." See Yurman, 262 F.3d at 111 (emphasis
added); LaChapelle v. Fenty, 812 F. Supp. 2d 434, 440 (S.D.N.Y.
2011) ("Originality in rendition may reside in the photographer's
selection of lighting, shade, lens, angle, depth of field,
composition, and other choices . . . that have an aesthetic effect
on the final work"(emphasis added)). Moreover, and in any event,
plaintiff fails to show similarities in protected cinematography,

---

[5] In each set of images, the scene from Palinoia is on the left, and
the scene from the Trailer and Film (captioned "Lemonade") is on the
right.

[6] The exceptions are Scene 1 ("Graffiti and Persons with Head Down")
and Scene 9 ("Side-Lit Ominous Figures"). The SAC states in broad
terms in a subsequent paragraph "themes in the LEMONADE Trailer
derive directly from the themes that are expressed through
Plaintiff's aesthetic decisions in the PALINOIA Work, including,
without limitation, the following themes: destruction, alienation,
heartbreak, and chaos versus order." SAC ¶ 79. This catch-all and
conclusory pleading fails to explain why the alleged similarities in
the still shots gives rise to any of the themes.

let alone that this cinematography gives rise to a similar aesthetic in the works.



The SAC titles the first set of screenshots, "Graffiti and Persons with Head Down." SAC ¶ 73(1). Both scenes feature the central character in a "state of distress," "leaning against a stable structure," with "head down, face hidden from the viewer." Id. The central characters are "facing left, and are shot from the subject's left." Id. Finally, the "structures display hand-painted graffiti words in similar styles." Id.

The concept of a "state of distress" is an unprotected idea not original to plaintiff. Cf. Cabell v. Sony Pictures Entm't, Inc., 714 F. Supp. 2d 452, 459 (S.D.N.Y. 2010) (citing Mattel, Inc. v. Azrak-Hamway Int'l, Inc., 724 F.2d 357, 360 (2d Cir. 1983) ("[A] fighting pose is an unprotectable idea under copyright law."). It also flows naturally and necessarily that a distressed character would be

leaning (as opposed to dancing) against something stable (as opposed to delicate) and that his or her head would be down (as opposed to up).[7] Similarly, the nature of the shot requires that the subject's face be "hidden" because, unless the camera was pointed upwards, the downward tilt of the subject's head would block the line of sight. These elements are therefore scènes à faire which cannot provide the basis for substantial similarity.

Plaintiff's alleged similarities in orientation and camera angle — "left" facing and shot "from the left" — fare no better, because they are so general that they rise to the level of unprotected ideas. To be sure, an artist's selection of orientation and camera angle can constitute protected expression. See Mannion v. Coors Brewing Co., 377 F. Supp. 2d 444, 447, 455 (S.D.N.Y. 2005) (holding that the "relatively unusual angle" of a photograph was protected expression where the "view is up and across the right side of [the subject's] torso, so that he appears to be towering above earth"). But here, plaintiff fails to allege that there is anything unusual about "facing" subjects to the "left" or shooting scenes "from the left." Cf. Peter F. Gaito Architecture, 602 F.3d at 60 (holding that "generalized notions of where to place functional elements" are insufficient to establish substantial similarity of protected expression). Plaintiff does not have a monopoly on "left

---

[7] Given the nature of the scenes, moreover, it makes no sense for the subjects' heads to be up. This would require the characters to be resting chin-first onto a wall and SUV, respectively.

facing" orientations and angles shot "from the left."

Once stripped of unprotected elements and scènes à faire, these scenes from Palinoia and the Trailer and Film have very little in common. The race, gender, wardrobe, and hairstyle of the characters in the shots are different. See Cabell, 714 F. Supp. 2d at 459 (granting motion to dismiss for lack of substantial similarity in part because of differences in hairstyle and costume). In Palinoia, the shot is of a Caucasian male with curly hair dressed in a dark jacket. In the Trailer and Film, the character is an African-American female with long braids and a fur-type jacket. The backgrounds of the two scenes are also different. While the protagonist in Palinoia is leaning against what appears to be a rooftop entrance, the character in the Trailer and Film is leaning against an SUV in a garage. Likewise, while Palinoia features lines of graffiti on the left side of the frame, reading "Fear not", the Trailer and Film show one line of indecipherable graffiti on the right side of the frame. See id. (noting differences in backgrounds); Kaplan v. Stock Mkt. Photo Agency, Inc., 133 F. Supp. 2d 317, 326 (S.D.N.Y. 2001) (rejecting allegations of substantial similarity because of differences in location, in part).

These differences in rendition create very different aesthetics in the two scenes. See Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 913 (2d Cir. 1980) ("As a matter of logic as well as law, the more numerous the differences between two works the less likely it is that they will create the same aesthetic impact so that one will

appear to have been appropriated from the other"). The protagonist
in Palinoia is no doubt distressed, but his grief seems small in
comparison to the vast wall, airy background, and instructive
graffiti. In contrast, the protagonist in the Film and Trailer seems
larger than life, in part because of the closer camera angle and the
subject's thicker jacket, creating a much stronger aesthetic of pain
and grieving. In short, while both scenes invoke distress, the
ordinary observer feels this sensation in radically different ways
in each of the works, thereby undermining plaintiff's allegations of
substantial similarity.



Plaintiff titles the second set of scenes, "Red Persons with
Eyes Obscured." SAC ¶ 73(2). The scenes are both "lit using a single
light with a red gel, creating a heavy contrast between red and
black," and shot at a "medium distance." Id. The subjects' eyes are
also "intentionally obscured." Id. Other than these alleged

similarities in cinematography, plaintiff does not identify a shared aesthetic.

Plaintiff is correct that both shots use "red gel" lighting. This film technique, however, did not originate with plaintiff and plaintiff does not allege that "red gel" lighting is a protectable element by itself.[8] Nor is it protectable here in combination with plaintiff's other alleged similarities. Plaintiff's claim that the scenes are shot at "medium distance" is no more concrete than his previous allegations concerning "left" facing orientations and camera angles, even when viewed in combination with an individual whose eyes have been obscured.

Moreover, the differences in cinematography between the scenes creates a vastly different aesthetic. The Palinoia shot is of a man with his eyes obscured by something resembling eggshells. He sits in a dark room and a light casts a long shadow on the wall to his left.

_____

[8] Plaintiff's counsel conceded as much at oral argument on the motion to dismiss, where the following colloquy took place:

> THE COURT: I just want to make clear, you are not claiming that the use of red gel, per se by itself, is the protectable element there but it is that in combination with other things? Do I have that right?
>
> MS. CAHILL: Yes. That's correct, your Honor. I do disagree -- I am not a filmmaker but my understanding is the use of red gel is fairly unusual in film. The plaintiff uses red gel in more than just this scene.
>
> THE COURT: But it didn't originate with your client.
>
> MS. CAHILL: I don't believe so.

Transcript dated Aug. 25, 2016, at 15-16.

This creates an alien aesthetic, particularly after the man peels off his eye coverings in a manner reminiscent of removing his own eyeballs. By contrast, the shot from the Film and Trailer lacks these surreal qualities. It is of a woman riding in a motor vehicle, with her hat dangling over her face. The scene is shot at close-up in the vehicle's rearview mirror and creates an aesthetic of looking back, both literally and figuratively. These significant differences overwhelm any superficial similarities between the scenes. See Cabell, 714 F. Supp. 2d at 459-60.



Plaintiff's third set of scenes is entitled "Parking Garage." SAC ¶ 73(3). The Court need not give a lengthy description of the garages themselves because a "ready-made scene or thing" is not protectable expression absent additional orchestration. See LaChapelle, 812 F. Supp. 2d at 441; Mannion, 377 F. Supp. 2d at 450 ("[T]he photographer of a building or tree or other pre-existing

object has no right to prevent others from photographing the same thing."). In terms of plaintiff's own contributions, the SAC alleges that the makers of Palinoia "chose not to use fill lights for darkened areas in the shots, leaving the only areas lit as those directly beneath the garage's own lights." SAC ¶ 73(3). The SAC also alleges that the "two images share similar color contrast," that the garages are "filmed with wide shots, looking from one end of the garage to another," and that the "images are framed to feature the garages' sectioned ceilings and concrete floors." Id.

These allegations are insufficient. Plaintiff, by his own admission, did not orchestrate the garage's lighting - he relied on the "garage's own lights" - and cannot manufacture protected expression by listing all the actions that he chose not to take. Cf. Mannion, 377 F. Supp. 2d at 450 ("[I]f a photographer arranges or otherwise creates the subject that his camera captures, he may have the right to prevent others from producing works that depict that subject" (emphasis added)). Likewise, to the extent that there is a "similar color contrast," plaintiff fails to allege that this was the result of any of plaintiff's decisions as opposed to the natural color scheme of the garages. Plaintiff's additional claim, that the garages are filmed with "wide shots," suffers from the same shortcoming as plaintiff's other allegations concerning camera angles: there is no claim that this generic camera angle is unique or unusual in this particular context.

To the extent that there is some minimal similarity of

14

protected expression, it is once again overwhelmed by the striking differences between the scenes. The Palinoia scene features a straight-ahead image of the garage with equally-spaced small round lights and square columns. The aesthetic is balanced and symmetrical. On the other hand, the garage in the Trailer and Film is shot from around a turn, skewing the image to the left and creating a strong color contrast between the right and left hand sides of the scene. The contrast is accentuated by the handful of unevenly-spaced, long fluorescent lights. This lack of symmetry creates a lopsided aesthetic (not present in Palinoia) that evokes anxiety and dread.



Plaintiff travels from garages to stairwells in his fourth set of scenes entitled "Stairwell." SAC ¶ 73(4). The scenes are of "dimly lit stairwells featuring worn, gritty, concrete stairs with handrails," utilize "angular, close-up shots," "and are filmed in a

fast sweeping motion." Id.

By now, the ordinary observer can likely guess the unprotected elements in plaintiff's description. The idea of a stairwell and the stock elements that come with it – wear and grit, concrete, handrails – cannot furnish the basis for substantial similarity. To the extent that the shots are filmed in a "fast sweeping motion," this is a common feature among cinema not original to Palinoia. See Identity Arts v. Best Buy Enter. Servs., Inc., 2007 WL 1149155, at *46 (N.D. Cal. Aug. 18, 2007), aff'd, 320 F. App'x 772 (9th Cir. 2009)("Nearly every movie trailer . . . involves the use of rapidly edited images."). Additionally, plaintiff's general descriptions concerning "angular" and "close-up shots" obscure the vast dissimilarities in the scenes' compositions. The Palinoia image looks down a length of tan stairwell, with stairs from the flight above framing the top of the shot. The filmmakers also prominently feature the stairwell's handrails and vertical bars. Plaintiff fails to allege what aesthetic this creates. On the other hand, the image from the Film and Trailer looks up at three to four blueish stairs shot at a closer distance. A window appears to illuminate the stairs from above, creating a color contrast between the front of the scene and the back. Unlike Palinoia, the aesthetic is cold and wintry.



The fifth set of images, titled "Black and White Eyes," show the protagonists' faces in black and white staring directly into the camera. SAC ¶ 73(5). The protagonists' expressions are "blank," and the "tops and bottoms" of their heads are "cut-off," which plaintiff alleges is "an unusual framing choice in a professionally produced film." Id. Plaintiff's conclusory allegation that this framing choice is "unusual" overlooks the very different ways in which the filmmakers accomplish this feat. The Palinoia shot is a close up of the protagonist's eyes and most of his nose. There is a strong color contrast between the edges and center of his face, and the background is dark. The aesthetic is cramped and claustrophobic. In contrast, the shot from Lemonade is a more complete shot of an African-American woman's face and hair, with only the bottom of her chin and top of her forehead "cut off." The woman's head does not fill the frame and there is a white background. Unlike Palinoia, the

aesthetic is focused yet airy. See Diodato, 388 F. Supp. at 393
(rejecting substantial similarity in part because of differences in
lighting and background); Cabell, 714 F. Supp. 2d at 460 (finding
that different backgrounds undermined claim of substantial
similarity).

The differences in aesthetic appeal of these two shots grows
even greater when taken in context of the scenes that come before
and after.[9] In the Film and Trailer, the scene does not open with the
protagonist "staring directly into the camera." Rather, the scene
begins with her eyes closed (unlike in Palinoia). In Palinoia, on
the other hand, the scene closes with the central character's eyes
rotating upwards as blood rolls down his forehead. No such
development occurs in the Film and Trailer.

---

[9] Counsel for the plaintiff herself stressed the importance of
evaluating scenes in context during oral argument on the motion to
dismiss:

> MS. CAHILL: There is actually no other form of artwork that is
> like a film in that a film combines a number of different forms
> of expression; there are visual elements, there are audible
> elements, there are things such as pace, plot, setting, mood,
> theme. A filmmaker has literally unlimited number of choices to
> construct a film from all of these different pots of elements
> and what you get at the end of the day is an audiovisual work
> that is never static, that is ever changing, that includes so
> many elements that the test for substantial similarity must be
> applied in a very different way.

Transcript dated Aug. 25, 2016, at 6 (emphasis added).



The sixth set of images, "Title Card Scenes," features exactly what the ordinary observer would expect: title cards. SAC ¶ 73(6). The cards use "only white text on a solid dark color background, with the titles of the works centered in the middle of the frame, printed in all capital letters and in strikingly similar fonts." Id.

The idea of a title card is neither protectable nor original to Palinoia. Cf. Identity Arts, 2007 WL 1149155, at *16 ("Nearly every movie trailer . . . involves the use of . . . title cards."). There are further a great number of dissimilarities between the scenes. While plaintiff describes the backgrounds as "dark," the colors are more nuanced. Plaintiff's background is a neon-blue, while defendants' is black. The fonts also are not the same. While the letters of "Lemonade" are relatively thick and bold, "Palinoia" is in a font with thinner letters and is followed by a period. These differences create different aesthetics. While the Palinoia title

jumps out at the observer, the Lemonade title recedes into the background.



The seventh set of images, "Blended Grass," depict a "center subject" surrounded by a blend of dead and living "overgrown grass." SAC ¶ 73(7). The shots contain "green and tan colors" and have similar "overall hues and color contrast against the focus subject." Id. It goes without saying that plaintiff does not have a copyright on the idea of overgrown grass. It also flows naturally from the choice of concept that there is a color contrast between green (living) grass and tan (dead) grass. At the level of protected expression, there is no similarity between the scenes' so-called "focus subject[s]." The center subject in Palinoia is a mound of earth, compared to the woman in the Film and Trailer. This difference creates a different aesthetic in each work: while

Palinoia evokes an ambiguous aesthetic (perhaps the outdoors), the aesthetic from the Trailer and Film is mysterious and clandestine.

Plaintiff is further incorrect that the scene in Palinoia is of overgrown grass. Instead, moments after plaintiff's still shot, a hand plants seeds in the dirt, revealing that the "overgrown grass" is actually a close up of a small mound of dirt surrounded by a few short blades of vegetation. Fortunately for the Court, and perhaps the gardener, "the works themselves supersede and control contrary descriptions of them." Peter F. Gaito Architecture, 602 F.3d at 64.



The eighth set of images, "Feet on Street," depicts "close-up shots of human feet shot from the middle of the leg down." SAC ¶ 73(8). Plaintiff alleges that the framing of the shots is "identical" in that "the feet are framed in the center both horizontally and vertically." Id. The images also "include strong contrast between light and dark, with shadows cast on the feet." Id.

Plaintiff's superficial similarities fail to overcome the scenes' overwhelming difference in aesthetic appeal. The scene from Palinoia throws the observer off-balance. While the subject's left leg is brightly lit, the right leg is only partially visible and there is a long shadow cast to the subject's right side. The subject's raised foot also makes the scene appear unsteady, further contributing to the off-balance aesthetic. In contrast, the scene from the Film and Trailer orients the observer to the subject's front. The individual's legs are both visible (albeit darkened) and bare skinned. The individual appears to be walking toward the camera on smooth polished stone framed by light, giving off a sacred or angelic aesthetic. Because plaintiff's technical similarities have little to no effect on the aesthetic appeal of the images, they fail to show substantial similarity of protected expression. See Dean v. Cameron, 53 F. Supp. 3d 641, 650 (S.D.N.Y. 2014) ("[T]he differences between each of [plaintiff's] works and [the allegedly infringing work] overwhelm any superficial similarity."); Segal v. Paramount Pictures, 841 F. Supp. 146, 149 (E.D. Pa. 1993) ("[T]he existence of some common features in the face of overwhelming differences between the works is insufficient to show substantial similarity.").



The ninth set of images, "Side-Lit Ominous Figures," lack even technical similarities. Plaintiff alleges that the images are "wide shots" of a center-placed individual whose feet have been "cut-off." SAC ¶ 73(9). The individuals are "lit from the right in a manner that obscures the faces for an ominous effect." Id.

Of course, plaintiff did not invent the idea of obscuring a subject's face, much less the archetype of an "ominous figure." Plaintiff's description of the two scenes also ignores the significant differences in the two shots' aesthetic appeal. The Palinoia shot is a daytime scene with a dark figure in yellow overalls and rubber gloves, framed against a bright building with several boarded-up windows. The feel is slightly apocalyptic. The scene from the Trailer and Film is a nighttime shot of a woman in a white wedding dress. The character is brightly lit against a dark background, giving off a ghostly aesthetic. In sum, the SAC's heavy

reliance on unprotected ideas, scènes à faire, vague and amorphous descriptions, and technical similarities undermines its claim that the works share substantial similarity in protected expression.[10]

Similarly, no reasonable jury, properly instructed, could find infringement based on plaintiff's next set of alleged similarities: the works' audio. Plaintiff alleges his work "includes an original and unconventional soundtrack" consisting of "disharmonious sounds interspersed with lines of narrated poetry" and the absence of "dialogue or song." Pl.'s Mem. of Law in Opp. to Defs.' Mot. to Dismiss the SAC ("Pl.'s Opp.") at 23, ECF. No. 35; see SAC ¶¶ 64-66. Plaintiff's description suffers from the same problems of idea versus expression that plague his nine "visual" examples. The idea of juxtaposing poetry and disharmonious sound is not protectable

---

[10] These factors also distinguish the present dispute from a decision on which the plaintiff heavily relies (although it is not binding on this Court), LaChapelle, 812 F. Supp. 2d at 434. The LaChapelle court addressed whether a defendant's audiovisual work infringed the plaintiff's copyrighted material, and held that the plaintiff met its burden of pleading substantial similarity. Unlike the present dispute, however, the LaChapelle plaintiff gave specific descriptions of his protected expression, including the way that he "select[ed] and orchestrate[d] the themes, props, settings, wardrobes and colors of his photographic subjects, while also controlling the angles, poses and lighting." Id. at 445 (internal quotations omitted). The court found that several scenes in the defendant's film contained these specific protected elements, such as a shot of a room exhibiting "hot-pink and white striped walls"; unusual windows with "glossy hot-pink casings and interior framework"; "hot-pink" ceilings, baseboards, and couch; "women wearing frizzy red wigs; a woman posed on top of a piece of furniture; black tape wrapped around a man; and a generally frantic mood."[10] Id. at 446. Plaintiff here fails to allege such specific similarities in protected expression or mood in his nine visual "examples," and no reasonable jury, properly instructed, could find otherwise.

expression.[11] See Croak, 2016 WL 1274713, at *3 ("[T]here can be no
question that plaintiff does not have a monopoly on all depictions
of a Pegasus, even those juxtaposed with the roof of an automobile,
no matter the form in which such juxtaposition is accomplished.").

Thus plaintiff must show that his particular expression of this
idea - including his particular choice of poetry and sound - has
been misappropriated. Plaintiff fails to meet his burden. While
poetry is protectable, the lines of poetry in Palinoia on the one
hand and the Trailer and Film on the other are different. The
alleged similarities in "disharmonious sounds" fare no better.
Plaintiff claims that the works follow a "similar pattern in which
harsh noises are separated by calmer sounds," and "include
crescendos and decrescendos." SAC ¶ 65. So too does Tchaikovsky's
"1812 Overture"[12] (complete with cannons) and the Beatles "Yellow
Submarine."[13] But these generic audio similarities do not amount to
protected expression. To the ordinary ear, the disharmonious sounds
in the works "bang" quite differently and, to the extent that there
is any similarity, it is because plaintiff rearranges the order of

---

[11] Similarly, plaintiff cannot manufacture protected expression by
pointing to all the expression that it could have used. If this were
not the case, then any form of expression would become protected
because the author could have added something more.

[12] Available at: https://www.youtube.com/watch?v=VbxgYlcNxE8 (last
visited September 9, 2016).

[13] Available at: https://www.youtube.com/watch?v=vefJAtG-ZKI (last
visited September 9, 2016).

the sounds in his submissions to the Court.[14] Copyright infringement
requires more than just dexterous lawyering.

Finally, no reasonable jury, properly instructed, could find
that the "total concept and overall feel" of Palinoia and the
allegedly infringing works are substantially similar. Apparently
intent on exploring the boundary between idea and expression,
plaintiff alleges that the works share the same narrative theme ("a
struggle of a relationship") and the same aesthetic mood and pace
("a pattern of successive montage of abstract scenes, with unknown
or unclear meanings, pieced together in 'short takes'"). Pl.'s Opp.
at 18. These alleged similarities fall firmly on the side of
unprotected ideas. The "struggle of a relationship" is a concept
familiar to us all, and plaintiff is not the first individual — or
artist — to comment on it. See, e.g., R. Hart-Davis, The Letters of
Oscar Wilde 621 (1962) ("[H]earts are made to be broken"); Taylor
Swift, "I Knew You Were Trouble"(2012).[15] Plaintiff likewise does not
have a monopoly on montages of short takes and abstract scenes, as
this aesthetic mood and pace is standard fare in film trailers. See
Identity Arts, 2007 WL 1149155, at *46.

---

[14] See Exhibit C, Pl.'s Opp. The Court does not reach the question
raised by defendants of whether plaintiff improperly attached
Exhibit C to its opposition, Defs.' Reply Br. at 10, ECF No. 36,
because the exhibit does not support plaintiff's claim in any event.

[15] But see Andy Warhol, The Philosophy of Andy Warhol, 27 (1975)
("When I got my first television set, I stopped caring so much about
having close relationships.").

At the level of protected expression, the differences in total concept and feel among the works are vast. The protagonist in Palinoia is a Caucasian male suffering in the wake of a failed relationship. The short film gives no reason why the relationship failed and there is no reconciliation. In addition, except for a line at the end of the short film, the only narration is in French and there are English subtitles throughout.

By contrast, the Film portrays an African-American woman's journey in her relationship through stages of suspicion, denial, anger, and reconciliation. Defs.' Br. at 1, 13. The catalyst for the journey is infidelity, and the conclusion of the journey is joyous. Id. at 1, 10, 13. Along the way, the Film marks the protagonist's progression through thematic headings, and narrates it with songs from the Lemonade album. Id. None of these elements is present in plaintiff's short film. See Allen v. Scholastic Inc., 739 F. Supp. 2d 642, 656-65 (S.D.N.Y. 2011) (rejecting substantial similarity because of, among other factors, differences in structure, theme, and plot); Green v. Lindsey, 885 F. Supp. 469, 482 (S.D.N.Y. 1992), aff'd, 9 F.3d 1537 (2d Cir. 1993) ("[T]he tonal difference is reinforced by the two works' entirely different endings.").

In partial response, plaintiff argues that the "race of the characters in the [Film] is irrelevant to the total concept and feel of a film about relationships." Pl.'s Opp. at 18. Plaintiff would be correct if the Film were just about relationships. But it is not, and plaintiff's say-so does not overwhelm the plain meaning of the

work. Peter F. Gaito Architecture, 602 F.3d at 64. The Film depicts
the protagonist's journey from a particular perspective: that of an
African-American woman in a predominantly African-American
community. Defs.' Br. at 1, 13. The Film repeatedly references and
dramatizes generations of African-American women, and in the
background of one scene, the observer hears an excerpt from a speech
by Malcolm X to the effect that the Black woman is the most
"neglected" person in America. Id. at 13. This all takes place
against what defendants accurately characterize as a "Southern
Gothic feel." Id. The settings transition between areas of New
Orleans, the abandoned Fort Macomb, and an Antebellum plantation.
These significant differences in characters, mood, and setting
further distinguish the total concept and feel in the Film from that
in Palinoia.  See Allen, 739 F. Supp. 2d at 656-65.

    Plaintiff also argues that because the works all "portray a
struggle of a relationship; the reasons for such struggle are
unclear and irrelevant." Pl.'s Opp. at 18. This is like saying that
Casablanca, Sleepless in Seattle, and Ghostbusters are substantially
similar despite the different motivating forces behind the struggles
there portrayed (Nazis, capitalism, and ghosts, respectively). But
"all fictional plots, when abstracted to a sufficient level of
generalization, can be described as similar to other plots," and
that is why the differences do in fact matter. See Jones v. CBS,
Inc., 733 F. Supp. 748, 753 (S.D.N.Y. 1990).

It is true, of course, that the differences in total concept
and feel are initially more pronounced between Palinoia and the Film
than between Palinoia and the Trailer. Unlike the 58-minute Film,
the Trailer is 65 seconds long, lacks thematic headings, contains no
songs, and is faster paced than the Film. The Trailer also exhibits
fewer elements of the Southern Gothic genre, although it does
include contrasts between sinister and innocent imagery, along with
grotesque, mystical, and macabre scenes from what appear to be the
American South. Nonetheless, the difference in overall concept and
feel between Palinoia and the Trailer still overwhelms any
superficial similarities.[16] The Trailer's scenes derive from the Film
and represent the story of an African-American woman going through
stages of grief following infidelity. The Trailer begins with the
image of an anguished African-American female leaning against an
SUV. It then cycles through a number of scenes, many of which
dramatize African-American women, before returning to the female
protagonist. The Trailer repeats this pattern several times. Each
time the Trailer returns to the protagonist, she raises her head
slightly higher, apparently rising up in empowerment. Throughout the
Trailer, there are voiceovers indicating that the woman is in a
relationship ("You're the love of my life"), that there has been

---

[16] Since the total concept and feel between the Trailer and Palinoia
significantly differs, as does the total concept and feel between
the Film and Palinoia, the defendants' strained argument that the
Film and Trailer should be evaluated as one combined piece for the
purposes of copyright analysis would, even if accepted, not change
the outcome in any respect.

infidelity ("What are you hiding?" and "Why can't you see me"), and that this infidelity has ended in reconciliation ("Pull me in, pull me in, pull me in"). In short, the Trailer shares the significant differences in theme, plot, characters, mood, and setting that also distinguish the Film from Palinoia.

Plaintiff acknowledges this "lengthy recitation of differences" but argues the "court must emphasize similarities and not differences." Pl.'s Opp. at 19-20. That is all well and good, but plaintiff must demonstrate that there are in fact some protected similarities. The Court questioned plaintiff's counsel about this issue during oral argument, and counsel responded that it is "a very difficult case" and likened the standard to "how many angels can dance on the head of a pin."[17] After additional prodding, counsel stated that the works share an overall aesthetic because the nine purportedly infringing scenes "have no connection whatsoever to the

───────────────

[17]
> THE COURT: Just talking about the overall feel as opposed to the individual items for a moment, what is it about -- how would you define what you think is the substantial similarity in overall feel?
>
> MS. CAHILL: I think that's a very difficult case and I often explain the test for copyright infringement as how many angels can dance on the head of a pin. Sometimes it feels that way because what we are trying to take, I think, in some ways is an abstract concept and put it into a written legal test.

Transcript dated Aug. 25, 2016, at 8.

story."[18] The problem for plaintiff is that while it is true that the works contain (very different) scenes of garages, stairwells, distressed characters, and the like, the similarities in presentation end there. In addition to the aforementioned differences in structure, theme, plot, characters, mood, and setting, the nine "unconnected" scenes take place in a different order in each work. See Decl. of Tom Ferber, Exhibit G, ECF. No. 37. This difference is material because, if the nine scenes truly have no connection to the stories, their aesthetic must arise from their relationship to each other (i.e. the sequence in which they occur). This sequence, however, is not even remotely the same.

For these reasons, and because an ordinary observer would not regard the "aesthetic appeal" of the works at issue as the same, Yurman, 262 F.3d at 111, or perceive defendants as having "misappropriated the original way in which [plaintiff] 'selected, coordinated, and arranged' the elements of his . . . work," Peter F. Gaito Architecture, 602 F.3d at 66, plaintiff's copyright infringement claim fails as a matter of law.

---

[18]

    MS. CAHILL: . . . . Filmmakers select scenes like this to evoke a certain film aesthetic or tell a story in a non-linear way and the plaintiff did just that in his film and when the defendant's films came out, he recognized that same aesthetic and that same story telling in this non-linear fashion and part of that was the inclusion of these particular elements and not just one, not just two, not just three, not just four, but all of those that have no connection whatsoever to the story.

Id. at 13-14.

For the foregoing reasons, the Court, in its Order dated August 31, 2016, granted defendants' motion to dismiss. That decision is hereby reaffirmed, and the Clerk of the Court is hereby directed to enter final judgment dismissing plaintiff's Second Amended Complaint with prejudice and to close this case.

      SO ORDERED.

Dated:     New York, NY
            September ⎗ , 2016

                                        JED S. RAKOFF, U.S.D.J.